# EXHIBIT 1

STATE OF MINNESOTA                                     DISTRICT COURT

COUNTY OF OLMSTED                                 THIRD JUDICIAL DISTRICT

---

Tap House Real Estate, LLC, individually          Court File No.
and on behalf of the putative class,              Case Type: Civil Miscellaneous/Other

                    Plaintiff,

vs.                                               **CLASS ACTION COMPLAINT**

City of Rochester,

                    Defendant.

---

Plaintiff, individually and on behalf of the putative class, for its complaint against Defendant states and alleges as follows.

## PARTIES

1. Plaintiff Tap House Real Estate, LLC is a Minnesota limited liability corporation at 2365 Commerce Drive NW, Rochester, MN 55901. Plaintiff brings this lawsuit individually and on behalf of the putative class described below.

2. Defendant City of Rochester ("the City") is a municipal corporation organized under the laws of the State of Minnesota and located in Olmsted County.

## BACKGROUND

3. On July 7, 2004, the Rochester City Council passed Resolution 350-04, titled "Resolution Establishing Traffic Improvement District Program" (the "Resolution"). The Resolution is attached as **Exhibit A** and incorporated by reference. The Resolution allows the City, by additional resolution, to create a Transportation Improvement District ("TID") for any area of the City "experiencing or anticipating new growth and substandard

streets." On information and belief, all if not most of the areas experiencing growth in the City have been put into fourteen TIDs.

4. The purpose of the Resolution is to shift the burden of paying for transportation infrastructure improvements from the public as a whole to developers, regardless of actual infrastructure needs occasioned by development. The Resolution states that each TID receives a "cost allocation" equal to "75% of the costs of all the transportation projects within the TID." The total costs of transportation projects include design and engineering costs, "acquisition of right-of-way" costs, and construction costs. The cost allocation is broken down into two categories: Substandard Street Reconstruction Costs ("reconstruction costs") or Substandard Street Capacity Costs ("capacity costs") (collectively, "TID fees"). Developers in a TID collectively bear 50% of total reconstruction costs and 100% of total capacity costs. Individual developers are allocated TID fees on a per-acre or trip-generated basis, according to an ad hoc formula. The City demands payment of TID fees as a condition of development agreements.

5. The City's TID fees are contrary to Minnesota law. TID fees: (1) are in the form of a predetermined money payment; (2) are adopted pursuant to local government powers to regulate new growth and purportedly provide adequate public facilities and services; (3) are intended to fund large-scale, off-site public facilities and services purportedly necessary to serve new development; and (4) are in an amount which is purported to be proportionate to the need for the public facilities generated by new development. These qualities of TID fees mirror those of the illegal and unauthorized impact fee in *Country Joe v. City of Eagan*, 560 N.W.2d 681, 685 (Minn. 1997).

6. To remove the appearance of illegality, the Resolution states that payment of TID fees is completely voluntary and no compulsion or coercion is used to obtain developers' agreement to pay them. But TID fees are "voluntary" in name only. The Resolution explains that a developer's alternative to paying TID fees is an indefinite development moratorium—a "very restrictive condition" restricting all development until public facilities are deemed adequate by the City. Put differently, the City holds developers' land hostage until developers agree to fund the City's wish-list of offsite infrastructure projects.

7. The Minnesota Supreme Court recently confirmed municipalities may not use "voluntary" contracts to strongarm developers into paying unauthorized transportation infrastructure fees. "[N]o part of Minn. Stat. § 462.358 [subdivision regulation statute] authorizes a statutory city to impose an infrastructure charge." *Harstad v. City of Woodbury*, 916 N.W.2d 540, 546 (Minn. 2018). "[B]ecause the statute does not authorize a statutory city to condition subdivision approval on an infrastructure charge, such a condition cannot be memorialized in a contract." *Id.* at 549. "[T]he pearl of great price here is approval of the subdivision agreement. A developer who fails to make a 'voluntary' payment in an amount [the City] finds acceptable faces the prospect of denial of the subdivision application. The infrastructure charge is thus a requirement and . . . there is nothing voluntary about it." *Id.*

8. TID fees are particularly coercive because the City sends the TID bill midway through the development process, after developers make significant investments. Moreover, the City keeps calculation of TID fees a secret. The City does not give

3

developers advance notice of the amount of TID fees or the detailed formula used to calculate them. The City does not publish which construction projects are in a TID, the total costs of these projects, the way these costs are allocated, or whether TID fees are updated to account for changes in costs, revenue projections, or patterns of development. The Resolution gives the City discretion to change the TID cost allocation to whatever it deems "more proportional or equitable." The net result is that many developers, including Plaintiff, receive a surprise TID bill, in an unassailable total amount, at a time when the only practical option remaining is to pay it.

9. Even opting out is not a real option. The City's policy is to specially assess TID fees against developers who try to opt out. The City's website, a true and correct copy of which is attached as **Exhibit B**, reflects the City's policy by identifying TID fees as one "[t]he most common improvements assessed by the City."

10. Minnesota caselaw reflects the City's custom of assessing "voluntary" TID fees. *See, e.g.*, *SJC Props. LLC v. City of Rochester*, No. A08-1536, 2009 WL 1920271, at *1 (Minn. App. July 7, 2009); *DeGeus Props. LLC v. City of Rochester*, No. 55-CV-10-4211, Verified Compl. ¶ 55, (Olmsted Cty. Distr. Ct. filed June 7, 2010).

11. In specially assessing TID fees, the City blatantly disregarded the advice of its city attorney, who wrote in a June 9, 2004 memorandum to City Council:

> If the City wishes to involuntarily impose a special assessment on property benefitting from a street improvement, the City can do so. But, the amount of the assessment is limited to the amount of increased market value the property experiences as a result of the improvement. A TID charge is NOT intended to be a special assessment charge.

A copy of the memo is attached as **Exhibit C**.

4

12. Since the Resolution's inception, TID fees have served their essential purpose of providing the City a lucrative source of cash, which comes free of the political ramifications of increased taxation. The TID fee that Plaintiff involuntarily paid under duress was $102,500.00, on or about fall of 2019. On information and belief, the City has collected tens of millions of dollars in TID fees since adopting the Resolution from developers similarly situated to Plaintiff.

13. Despite numerous post-*Harstad* protests, the City has continued to impose arbitrary and unlawful TID fees.

## CLASS ALLEGATIONS

14. Plaintiff brings this action individually and on behalf of all individuals similarly situated as a class action pursuant to Rules 23.01 and 23.02 of the Minnesota Rules of Civil Procedure.

15. The Minnesota Rule 23 Class is defined as follows: All entities subject to the payment of TID fees.

16. This action is maintainable as a class under Minnesota Rules of Civil Procedure 23.01 because the individuals in the putative class are so numerous that joinder of all members is impracticable—the number of class members exceeds several hundred, there are questions of law of fact common to the class, the claims or defenses of the representative parties are typical of the claims or defenses of the class, and the representative parties will fairly and adequately protect the interest of the class.

17. This action is also properly maintainable as a class action under Minn. R. Civ. P. 23.02 because questions of law or fact common to members of the class predominate over

questions affecting only individual members and because the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

18. The members of the class identified above are so numerous that joinder of all members is impracticable. The exact number of this class is unknown, but it will be comprised of hundreds of class members. The exact number may be determined from records maintained by the City.

19. There are numerous and substantial questions of law and fact common to the putative class that predominate over questions solely affecting individual members, including, but not limited to the following:

      a. Whether TID fees are lawful;

      b. Whether TID fees must be refunded;

      c. Whether the City properly accounted for TID fees; and

      d. The proper measure of damages for class members.

20. Defendant is expected to raise common defenses to this class action, including a denial that its actions violated the law.

21. The claims of the named Plaintiff, set forth herein, are typical of the claims of the class. The named Plaintiff has the same interests and suffer from the same injury as the class members. The named Plaintiff and the class the named Plaintiff seeks to represent all have been subject to forced payment of TID fees.

22. The named Plaintiff has the incentive and is committed to prosecuting this action. Plaintiff will fairly and adequately protect the interests of the putative classes and have retained as counsel a law firm that numerous courts have found sufficiently experienced

6

and competent in the prosecution of class action and complex litigation. There are no known conflicts between Plaintiff or class counsel and the class that class counsel seek to represent.

23. This action is maintainable as a class action because the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the putative class, which would establish incompatible standards of conduct for the City and would be a waste of limited judicial resources.

24. This action is maintainable as a class action because the City has acted on grounds generally applicable to the classes, thus making declaratory relief, equitable relief, and damages appropriate with respect to the classes as a whole.

25. Upon information and belief, no other member of the class has an interest in individually controlling the prosecution of his or her claims, especially in light of the relatively small value of each claim and the difficulties involved in bringing individual litigation against a powerful entity.

26. Plaintiffs are unaware of any other litigation concerning this controversy commenced by or for other class members.

27. Litigation should be concentrated in this forum because the City is headquartered and located within this forum.

28. The Court has the resources and ability to effectively manage this class action.

## COUNT I
## DECLARATORY JUDGMENT

29. All allegations are incorporated and restated.

30. There is a real, immediate, substantial, continuing, and justiciable controversy between the parties requiring the intervention of the Court regarding the legality of the Resolution and the refund rights provided by the Resolution.

31. Plaintiff and the Class seek a declaration that TID fees are illegal, null, void, and unenforceable. TID fees are preempted by law, including Minn. Stat. § 462.358. TID fees violate Minn. Stat. § 462.353, subd. 4(a), which states municipal fees must be "by ordinance" and "must be fair, reasonable, and proportionate and have a nexus to the actual cost of the service for which the fee is imposed." The City adopted TID fees by resolution, not ordinance. TID fees are not fair, reasonable, or proportionate, nor do they have a nexus to the actual cost of the service for which the City seeks to impose the fee. TID fees unduly burden the rights of Plaintiff and the Class under the Takings Clauses of the Minnesota and United States Constitutions. The City exacted TID fees from Plaintiff and the Class far out of proportion to the needs created by development, to avoid imposing the burden of paying for additional services on all citizens via taxation.

32. Plaintiff and the Class also seek a declaration that TID fees must be refunded. The Resolution states: "Revenue collected in excess of that ultimately needed in the respective TID must be refunded to the property owners in the TID at the time the TID is dissolved." Substantial uncertainty exists between the parties regarding the question of whether all TIDs in the City are "dissolved" by effect of law if TID fees are declared illegal,

null, and void. Substantial uncertainty also exists because the City has not created a refund procedure and continues to impose TID fees arbitrarily. Substantial uncertainty also exists because, on information and belief, the City collected and retained revenue in excess of that "ultimately needed" in each TID, failed to use "new revenues" to reduce TID cost allocations as contemplated by the Resolution, and impermissibly commingled funds across TIDs, in violation of the Resolution.

33. Pursuant to Minn. Stat. §§ 555.01–.16 and Minn. R. Civ. P. 57, Plaintiff and the Class are entitled to a declaration that TID fees are illegal and must be refunded, plus an award of prejudgment interest, costs, and disbursements.

## COUNT II
## MONEY HAD AND RECEIVED

34. All allegations are incorporated and restated.

35. The City collected $102,500.00 of TID fees from Plaintiff and, on information and belief, tens of millions of dollars of TID fees from the Class. The City's exaction of TID fees from Plaintiff and the Class was illegal, and Plaintiff and the Class involuntarily paid these fees under coercion and duress. The City will be unjustly enriched at the expense of Plaintiff and the Class if allowed to keep ill-gotten TID fees. Plaintiff and the Class are entitled to judgment against the City for money had and received in an amount exceeding $50,000.00, plus prejudgment interest, costs, and disbursements.

36. Plaintiff and the Class are also entitled to an equitable accounting of TID fees. Equity demands, and the Resolution contemplates, that unspent TID fees be returned at the end of the TID program. Calculating TID fee refunds will be extremely complicated for

several reasons: (1) on information and belief, the City commingled TID funds across TIDs, even though the Resolution states: "Revenue collected within a specific TID must be spent only within that TID"; (2) on information and belief, there are hundreds of claimants; (3) on information and belief, the City collected and retained revenue in excess of that "ultimately needed" in each TID; and (4) on information and belief, the City failed to use "new revenues" to reduce TID cost allocations as contemplated by the Resolution,.

37. Plaintiff and the Class are entitled to a judgment of the Court compelling the City to perform a full accounting of TID fees, placing all TID fees in constructive trust for the benefit of and refund to the rightful owners, and awarding prejudgment interest, costs, and disbursements.

## COUNT III
## UNJUST ENRICHMENT

38. All allegations are incorporated and restated.

39. The Class conferred a benefit on the City by paying TID fees. The City accepted the TID fees and retained them. It is inequitable for the City to retain TID fees, as the City imposed TID fees illegally and coercively. As direct result of the City's illegal and coercive imposition of TID fees, Plaintiff and the Class are entitled to judgment against the City in the full amount of TID fees paid in an amount in exceeding $50,000.00, plus prejudgment interest, costs, and disbursements.

## COUNT IV
## SECTION 1983 — TAKINGS CLAUSE

40. All allegations are incorporated and restated.

41. This count is asserted pursuant to 42 U.S.C. § 1983.

42. "[T]he government may choose whether and how a permit applicant is required to mitigate the impacts of a proposed development, but it may not leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013). A government's decision to exceed these limits is a "constitutionally cognizable injury." *Id.* at 607.

43. TID fees are unconstitutional exactions that unduly burden the rights of Plaintiff and the Class under the Takings Clause of the United States Constitution, as incorporated by the Fourteenth Amendment. TID fees are imposed under color of law and as official policy of the City, per the Resolution. TID fees are not fair, reasonable, or proportionate and lack a nexus to the actual cost of service for which they are imposed. On information and belief, the City calculated TID fees arbitrarily and without the allocation reductions contemplated by the Resolution, commingled TID fees across TIDs, and spent TID fees on projects far removed from the TID in which they were collected.

44. As a direct result of the City's violation of the Fifth and Fourteenth Amendment rights of Plaintiff and the Class, Plaintiff and the Class are entitled to damages in an amount exceeding $50,000.00, prejudgment interest, costs, disbursements, and attorney's fees pursuant to 42 U.S.C. § 1988(b).

## COUNT V
## SECTION 1983—DUE PROCESS

45. All allegations are incorporated and restated.

46. This count is asserted pursuant to 42 U.S.C. § 1983.

47. If a state actor places a taxpayer under duress to pay a tax promptly when due and relegates him to a postpayment refund action in which he can challenge the tax's legality, the Due Process Clause of the Fourteenth Amendment obligates the State to provide meaningful backward-looking relief to rectify any illegal deprivation.

48. TID fees are an illegal tax, which the City imposes as a matter of official policy and under color of law, as set forth in the Resolution. The City fails to provide developers with a meaningful opportunity or process to withhold payment and obtain a pre-deprivation determination of the validity of TID fees. The City does not provide a meaningful disclosure of how TID fees are set. TID fees must be paid promptly, or developers are unable to proceed with development. The City does not give developers a meaningful, post-deprivation remedy. There is no meaningful opportunity to be heard. The total failure of the City to provide a adequate pre- or post-deprivation process to challenge TID fees or seek a refund of TID fees violates Due Process.

49. As a direct result of the City's violation of the Due Process rights of Plaintiff and the Class, Plaintiff and the Class are entitled to damages in an amount exceeding $50,000.00, prejudgment interest, costs, disbursements, and attorney's fees pursuant to 42 U.S.C. § 1988(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class request that the Court:

1. Certify this case as a class action;

2. Designate Plaintiff as class representative and Plaintiff's counsel as class counsel;

3. Declare that TID fees are illegal, null, void, and unenforceable;

4. Declare that all TID fees must be refunded;

5. Order a full accounting of TID fees;

6. Place all TID fees in constructive trust;

7. Award Plaintiff and the Class damages to compensate them for the injuries they suffered as a result of Defendant's unlawful conduct;

8. Award Plaintiff costs, disbursements, prejudgment interest, and attorney's fees;

9. Enter judgment favor of Plaintiff and the Class on their claims against Defendant in an amount exceeding $50,000.00, including attorney's fees, the exact amount to be proven at trial;

10. Grant Plaintiff leave to amend if the Court finds the Complaint deficient;

11. Grant leave to join additional plaintiffs; and

12. Award such other and further relief as the Court deems just and equitable.

Dated: February 3, 2022.

MESHBESHER & SPENCE, LTD.

By: _____

Andrew L. Davick (#332719)
Konstandinos Nicklow (#225526)
Anthony J. Nemo (#221351)
Attorneys for Plaintiff
2519 Commerce Drive NW, Suite 120
Rochester, MN 55901
Telephone: (507) 280-8090
Fax: (507) 280-0807
Email: adavick@meshbesher.com
gnicklow@meshbesher.com
tnemo@meshbesher.com

## ACKNOWLEDGMENT

I hereby acknowledge that costs, disbursements, and reasonable attorney fees may be awarded to the opposing party pursuant to Minn. Stat. §549.211, if the Court should find that I acted in bad faith, asserted a claim or defense that is frivolous and that is costly to the other party, asserted an unfounded position solely to delay the ordinary course of the proceedings or to harass, or committed a fraud upon the court.

Dated: February 3, 2022.                    _____

Andrew L. Davick

14

RESOLUTION ESTABLISHING
TRAFFIC IMPROVEMENT DISTRICT PROGRAM

WHEREAS, the United States faces a significant problem in maintaining existing public infrastructure (streets, roads, highways, bridges, pedestrian walkways, bike paths).   In September, 2003, the American Society of Civil Engineers estimated that $1.6 trillion dollars were needed nationwide over a five-year time period to bring public infrastructure up to an acceptable state of repair and maintenance.  This figure had increased by $300 billion since 2001 because of large growth and increased development; and,

WHEREAS, the City of Rochester also faces a significant problem in maintaining its existing public infrastructure.  The City has over 300 miles of local streets for which it is responsible for maintenance and repair.  This network of local streets has been growing by eight to ten miles per year during the past five years.  Currently, the City faces a backlog of unfunded street maintenance needs totaling about $26,500,000.  The City's Public Works Director estimates that $210,000,000 will be needed to maintain the existing street system and the new streets added by new development over the next 20 years; and,

WHEREAS, the City's Public Works Director projects that over the next 40 years, there would be over $175,000,000 (or approximately 80 miles) in arterial and collector road construction and reconstruction needed to support new growth; and,

WHEREAS, the City's infrastructure deficit is compounded by new development, its impact upon adjacent public streets and the City's future financial and engineering plans to improve the capacity of the adjacent public streets.  The Minnesota Court of Appeals has recognized the fact that subdivision development places a great burden on municipal services including city streets.  Middlemist v. City of Plymouth, 387 N.W.2d 190, 193 (Minn. Ct. App. 1986).  The City does not have the financial resources to upgrade or improve the available public infrastructure for each and every new development proposed to be located somewhere within the City's boundaries; and,

WHEREAS, the lack of adequate street and road facilities to handle the vehicular traffic generated by new development results in enormous societal costs in the form of environmental pollution, energy consumption, increased energy costs, decreased economic productivity and a general decline in a citizen's quality of life as a person spends more and more time trying to get from here to there.  In addition, emergency services suffer as traffic congestion and accessibility problems reduce response times; and,

WHEREAS, Minnesota law addressing a city's ability to regulate development and subdivision activities is found in Minnesota Statutes, Chapter 462; and,

WHEREAS, Minnesota Statutes, Section 462.358, subd. 1a, states that "[t]o protect and

1



promote the public health, safety, and general welfare, to provide for the orderly, economic, and safe development of land, ... and to facilitate adequate provision for transportation, water, sewage, storm drainage ... and other public services and facilities, a municipality may by ordinance adopt subdivision regulations establishing standards, requirements, and procedures for the review and approval or disapproval of subdivisions;" and,

WHEREAS, Minnesota Statutes, Section 462.358, subd. 2a, states that "[t]he standards and requirements in the regulations may address without limitation: the size, location, grading, and improvement of lots, structures, public areas, streets, roads, trails, walkways, curbs and gutters, water supply, storm drainage, lighting, sewers, electricity, gas, and other utilities; ... and the protection and conservation of flood plains, shore lands, soils, water, vegetation, energy, air quality, and geologic and ecologic features;" and,

WHEREAS, Minnesota Statutes, Section 462.358, subd. 2a states that "[t]he regulations may permit the municipality to condition its approval on the construction and installation of sewers, streets, electric, gas, drainage, and water facilities, and similar utilities and improvements;" and,

WHEREAS, Minnesota Statutes, Section 462.358, subd. 2a states that "[t]he regulations may permit the municipality to condition its approval on compliance with other requirements reasonably related to the provisions of the regulations and to execute development contracts embodying the terms and conditions of approval;" and,

WHEREAS, in response to and as authorized by the above-cited provisions of the Minnesota Statutes, the City of Rochester has adopted subdivision regulations. They can be found in Chapters 60-65 of the Rochester Code of Ordinances (commonly referred to as the "Land Development Manual"); and,

WHEREAS, to facilitate the adequate provision of public facilities and services as authorized by Minnesota Statutes, Section 462.358, subd. 1a, the City adopted adequate public facilities standards as part of its adoption of the City's subdivision regulations. These standards are found in Sections 64.130 – 64.139 of the Rochester Code of Ordinances (R.C.O.). The City adopted these standards in May, 1999. A copy of these standards is attached, identified as Exhibit #A and incorporated herein; and,

WHEREAS, adequate public facilities standards have been recognized as one of the most effective forms of growth management (Gary Pivo, Growth Management Planning & Research Clearinghouse Local Government Planning Tools, (Aug. 1992)). Adequate public facilities standards have been judicially approved in cases across the nation and in Minnesota (Matter of Golden v. Planning Board of Town of Ramapo, 30 N.Y.2d 359, 334 N.Y.S.2d 138, 285 N.E.2d 291, app. dismissed, 409 U.S. 1003 (1972); Woodbury Place Partners v. Town of Woodbury, 492 N.W.2d 258 (Minn. Ct. App. 1992), cert. denied, 113 S.Ct. 2929 (1993); Freundshuh v. City of Blaine, 385 N.W.2d 6 (Minn. Ct. App. 1986); Larsen v. County of Washington, 387 N.W.2d 902 (Minn. Ct. App. 1986); Garipay v. Town of Hanover, 351 A.2d 64 (N.H. 1976); White, S. Mark. Adequate Public Facilities Ordinances and Transportation Management (American Planning Association, Planning Advisory Service Report No. 465,

2

1996); and,

WHEREAS, the purpose of Adequate Public Facilities standards is:

1. To economize on the costs of municipal facilities and services to carefully phase residential development with efficient provision of public improvements;
2. To establish and maintain municipal control over the eventual character of development;
3. To establish and maintain a desirable degree of balance among the various uses of the land; and
4. To establish and maintain essential quality of community services and facilities; and,

WHEREAS, by these adequate public facilities standards, the City seeks to regulate the timing and sequencing of development so that the provision of adequate public facilities required to accommodate the development growth occurs concurrently with the development growth. Put another way, these adequate public facilities standards require development be timed and sequenced in a manner consistent with the capacity of public facilities. The City's goal is to insure that public facilities are capable of supporting and servicing the proposed development's physical area and designated intensity; and,

WHEREAS, in addition to the adequate public facilities standards listed in R.C.O. §§ 64.130 – 64.139, the City's subdivision regulations also include adequate public facilities standards within the criteria provided for the City review of particular subdivision processes. Thus, a general development plan cannot be approved unless on and off-site public facilities are adequate, or will be adequate if the development is phased in, to serve the properties under consideration (see R.C.O. §61.215(5)). And, a preliminary plat (land subdivision) cannot be approved unless the proposed land subdivision takes into account the City's six-year Long-Range Capital Improvements Program (see R.C.O. §61.225(F)); and,

WHEREAS, the City's subdivision regulations allow the City to impose a condition on its approval of a proposed development where the condition is needed to insure compliance with the subdivision regulations (see R.C.O. §61.226); and,

WHEREAS, since the May, 1999, implementation of the City's adequate public facilities standards as part of the City's subdivision regulations, there have been developments submitted to the City for approval where the public facilities were inadequate. In these cases, one of three consequences occurred in the processing of the development applications; and,

WHEREAS, consequence #1 of the existence of inadequate public facilities is City approval of the proposed development, but with a very restrictive condition attached to the City's approval. That condition restricts all development until such time as the Common Council determines there are adequate public facilities to accommodate the proposed development; and,

3

WHEREAS, one example of consequence #1 is the following condition of approval placed upon the General Development Plan #180 (Prairie Crossing):

> Because on and off site public facilities are currently inadequate to handle the proposed development, the development must be phased-in in a manner consistent with the City's planned infrastructure improvements. Specifically, there are no plans for sanitary sewer to serve the property within the first three years of the City's current six-year Capital Improvement Program. Further, no other arrangements have been made to ensure that adequate utilities will not be available concurrent with the proposed development. Additionally, there are no plans to reconstruct 65th Street N.W., or Bandel Road to handle the additional traffic that this development will generate. As such, no development will occur and no further development permit will be issued until the Council determines public facilities are adequate to accommodate this development; and,

WHEREAS, consequence #2 of the existence of inadequate public facilities is the City approval of the proposed development, but with a condition restricting the amount and extent of development to coincide with the level of adequate public facilities that currently exists or may occur in the future; and,

WHEREAS, one example of consequence #2 is the following condition of approval placed upon General Development Plan #142 (Weatherstone):

> The development shall be phased so that 50th Street N.W., north of 55th Street N.W., does not exceed approximately 3,000 average daily trips before it is upgraded; and,

WHEREAS, consequence #3 of the existence of inadequate public facilities is the execution of development contracts (commonly referred to as development agreements) as specifically authorized by Minnesota Statutes, Section 462.358, subd. 2a. By these development agreements, the developer and the City voluntarily agree as to how much each entity should pay to bring the appropriate public facilities up to a level adequate to accommodate the proposed development; and,

WHEREAS, the decision to enter into development agreements is completely voluntary and optional on each developer's part. Some developers have been willing to live with the adequate public facilities' conditions of approval found in consequences #1 and #2. Other developers, however, have chosen to help make inadequate public facilities adequate so as to allow their proposed developments proceed as scheduled. To keep their developments on schedule, some developers have decided to follow consequence #3; and,

WHEREAS, recently, there have been developers who have expressed an interest in development agreements for their proposed developments (consequence #3), but have also expressed concern about the amount of their financial contributions towards the improvement of

4

the public facilities. They have indicated an interest in knowing in advance the scope and extent of the current public facilities, the scope and extent of improvements needed to those public facilities in order to accommodate future development and the costs associated with making public facilities adequate; and,

WHEREAS, in response to the developers' call for more information on adequate public facilities and the costs that might be associated with development agreements, the City of Rochester Common Council wishes to establish Transportation Improvement Districts ("TID") in areas of the City where new development is likely to occur. The purpose of a TID is to designate a geographic area of the City with existing substandard streets that would need to be improved or replaced if new development were to occur within that area. For each TID, there would be notice and information to a developer as to the costs that are at stake and the manner in which the City believes the costs should be divided between the City and the developer should the developer voluntarily enter into a development agreement for that development. The TID seeks to equitably distribute the transportation improvement costs created by new development between those property owners who benefit from the transportation improvements and the City; and,

WHEREAS, the recently-concluded Transportation Funding Task Force, which met to discuss the City's growth-related transportation funding needs, supports the City's creation of a TID. Among the Task Force's 28 recommendations to the Common Council was a recommendation to create a TID as a tool to fund a portion of the growth in the City's street system attributable to new development.

NOW, THEREFORE, BE IT RESOLVED that the Common Council of the City of Rochester that the City establish the TID program as follows:

1.  For purposes of this resolution, the term "development" means any man-made change to improved or unimproved real estate including a change in use or the creation of a subdivision. The term "developer" means any person engaging in any development activity for which city approval is sought.

2.  By an additional resolution, the Council may establish a TID for any geographic area of the City experiencing or anticipating new growth and substandard streets. The Council's determination of those areas experiencing or anticipating new growth will be based upon its review of the City's urban service boundaries and all other relevant factors that might reveal development trends over the next 40 to 50 years. The TID will be established after reviewing the growth areas containing substandard streets, the transportation system needs of the area based upon its land use plan and zoning classifications, and the amount of each area's vacant developable acreage.

3.  In creating a TID, the Council will consider the following factors:

    A.  The transportation system improvements necessitated by current or anticipated development in a particular geographic area of the City.

5

B.    The particular geographic area of the City that would be served by the TID improvements.

C.    The total costs for the necessary transportation improvements.

D.    The amount of the costs of the necessary transportation improvements to serve a particular geographic area that should be allocated to the development and to the City.

E.    The method of cost allocation that should be used to establish a proportional and equitable distribution of the transportation improvement project costs.

4.    The additional resolution will establish a cost allocation for each TID. The cost allocation will be calculated as 75% of the costs of all the transportation projects within the TID. These costs will include, but will not be limited to, the costs of design and construction engineering services, acquisition of right-of-way and construction. The cost allocation will be made up of two cost components.

A.    A Substandard Street Reconstruction Cost ("SSRC"); and,

B.    A Substandard Street Capacity Cost ("SSCC").

The above two items will be added together based on the proposed street section cost for the transportation improvements needed in the TID area to establish the TID cost allocation.

5.    An additional resolution will establish a cost allocation for each Interchange TID. The Interchange TID cost allocation will be calculated as a portion of the cost of the interchange that would equal the cost of a signalized expressway intersection that would be necessary to serve properties in the district. The City will assume the balance of the interchange project cost. Distance/proximity increments may be used to apportion the Interchange TID cost allocation with property closer to the interchange assuming a greater amount of the cost allocation. These costs will include, but will not be limited to, the costs of design and construction engineering services, acquisition of right-of-way and construction. The Interchange TID will be made up of two cost components:

A.    A Substandard Street Reconstruction Cost ("SSRC"); and,

B.    A Substandard Street Capacity Cost ("SSCC").

The above two items will be added together based on the proposed street section cost for the transportation improvements needed in the TID area to establish the TID cost allocation.

6

6.  A.  When the proposed TID serves an area zoned for low density residential uses, the SSRC and the SSCC are divided by the gross or net developable acres in the TID area. The result is a cost per acre that is the basis for the TID substandard street reconstruction and capacity cost allocation.

    B.  When the proposed TID serves an area not zoned for low density residential uses, the SSRC and the SSCC are calculated differently. The SSRC is divided by the gross or net developable acres in the TID area. The SSCC is divided by the gross vehicle trips or the p.m. peak hour vehicle trips generated from the acres in the TID area. The result is a SSRC per acres and a SSCC per trip that is the basis for the TID substandard street reconstruction and capacity cost allocation.

    C.  The City Council may, from time to time, elect to modify the basis for the TID cost allocation from net or gross developable acres to trips or vice versa if the Council determines that the alternative basis for the TID cost allocation represents a more proportional or equitable distribution of costs.

7.  A.  For each TID area, 50% of the SSRC for the reconstruction of a roadway up to a 40-foot wide rural section street or the equivalent 36-foot wide urban street will be allocated to the City. Fifty percent of the SSRC equal to 50% of the cost of reconstructing a 40-foot wide rural section street or its equivalent urban section will be allocated to the developer.

    B.  For each TID area, none of the SSCC for the construction of additional roadway and intersection capacity will be allocated to the City. The SSCC equal to 100% of the cost to construct additional roadway capacity up to a maximum 52-foot roadway width will be allocated to the developer. Additionally, the SSCC equal to 100% of the cost to construct additional intersection capacity regardless of the intersection width will be allocated to the developer.

8.  The applicable development agreement will provide the details as to when these cost allocations are assumed by each party. The time for payment set forth in the development agreement is related to the timing of the impacts of construction of the development. In all cases the cost allocations must be assumed within three to five years of the development agreement's execution.

9.  Revenue collected within a specific TID must be spent only within that TID. Revenue collected in excess of that ultimately needed in the respective TID must be refunded to the property owners in the TID at the time the TID is dissolved (It is the City's understanding that cost allocations will ultimately be borne by individual property owners).

7

10. The City may, from time to time, secure new or one-time revenue such as federal transportation funds or local option sales taxes for certain transportation projects within any particular TID or Interchange TID. The City will use these new revenues to reduce the City's cost allocation of that TID or Interchange TID. If after reducing the City's cost allocation to zero, the City will apply any remaining revenue to reduce the TID or Interchange TID cost allocations. In those cases where the State or County contributes to the funding of certain projects within any particular TID or Interchange TID, the City will use these State and County funds to reduce the overall project cost for that TID or Interchange TID project before calculating the TID or Interchange TID cost allocation.

11. The City Council may from time to time elect to use Municipal State Aid System (MSAS) funds for TID or Interchange TID projects. In any given fiscal year the Council's use of MSAS funds for TID or Interchange TID project(s) shall be limited to not more than 50% of that year's available MSAS construction account allocation. In no case shall an individual TID or Interchange TID project be funded with more than 50% MSAS funds.

12. Prior to the award of a contract to construct a proposed TID or Interchange TID improvement, and by way of a contribution agreement executed by benefiting property owners, the City may require an initial, upfront commitment of at least 60% of the cost of a particular transportation project in a TID or Interchange TID.

13. The City Council may, from time to time, review and revise by resolution the TID cost allocation for any specific TID if the Council determines that prior TID cost allocation established by the City are inadequate to fund the remaining projects within the specific TID. Revised TID cost allocations will not apply to fully executed development agreements that address TID cost allocation.

BE IT FURTHER RESOLVED that the City will not involuntarily impose any of the charges, fees, costs or costs allocations described in the TID program. Instead, any reference to or mention of any charge, fee, cost or costs allocation occurs solely for the use by potential developers and City staff in responding to proposed developments involving inadequate public facilities that might be made adequate by way of voluntary development agreements.

8

BE IT FURTHER RESOLVED that this policy becomes effective as of July 8, 2004.

PASSED AND ADOPTED BY THE COMMON COUNCIL OF THE CITY OF ROCHESTER, MINNESOTA, THIS _7th_ DAY OF _July_, 2004.

_____
PRESIDENT OF SAID COMMON COUNCIL

ATTEST: _Valori Langseth_
Deputy CITY CLERK

APPROVED THIS _8th_ DAY OF _July_, 2004.

_____
MAYOR OF SAID CITY

(Seal of the City of
 Rochester, Minnesota)

Res2000\ResolUTIO

9



COVID-19 Information    Information and Updates for Community Members

### CITY OF ROCHESTER
MINNESOTA

507-328-2900    JOBS    NEWS      

ABOUT    RESIDENTS    BUSINESSES    GOVERNMENT    SERVICES    MEETINGS

## CITY CLERK

Official Notifications

+ City Information and Communications

− Assessments and Administrative Fines

    Assessment Lookup

    Special Assessments

    Assessing Unpaid City Charges

    Special Service District

    Assessment Process

    Pending Assessments

    Appeals

    Deferrals

    Status Information

    FAQ's for Assessments and Admin. Fines

+ Elections

+ Licenses and Permits

    Parking Violations

+ Records

    Polco

    Blog

    Catering Permit Submission

Government » Departments » City Clerk » Assessments and Administrative Fines »

# What Are Special Assessments?

Font Size: ⊞ ⊟    Share & Bookmark    Print

Special assessments are charges to specific properties for public improvements constructed or maintained by the City. Special assessments cover all or a portion of the cost. The most common improvements assessed by the City are:

- Construction, reconstruction, replacement or installation of streets, sidewalks, pavement, gutters, curbs, lighting, boulevard landscaping, trees
- Construction of Water main, storm sewer or sanitary sewer systems
- Installation of above-standard street lighting systems
- Reconstruction of alleys
- Construction of new sidewalks
- Installation or repair of water service lines
- Installation of fire protection systems
- Transportation Improvement District
- Water Availability Charges
- Sanitary Availability Charges

## What other charges can be assessed or levied to my property taxes?

- Nuisance Abatement / Unpaid City Charges/Administrative Fines
- Tax Levy/Special Service District

### CONTACT INFORMATION

201 4th Street SE
Room 135
Rochester, MN
55904 (Map)

Phone: 507-328-2900
Fax: 507-328-2901
TDD: 507-328-2900

**Mon-Fri** 8:00 am to 5:00 pm

Department Contacts



EXHIBIT B

# OFFICE OF THE CITY ATTORNEY
## MEMORANDUM

DATE:       June 9, 2004

TO:         Mayor and Common Council

FROM:       Terry L. Adkins – Rochester City Attorney TLA

SUBJECT:    Transportation Improvement District Charges


I am told the issue of Transportation Improvement District charges will be back before the Council at its June 14th Committee of the Whole meeting.  Since the last time the Council considered this topic, several council members discussed with me the imposition of TID charges on developers. And, at the last Committee of the Whole meeting, Dave Bishop made a not-so-subtle threat to contest the legality of the TID concept.  Based upon my conversations with several of you, it is apparent to me that there is some misunderstanding about the TID concept.  The purpose of this memo is to explain why the TID charges are voluntary and cannot be imposed on developers without their consent.

An impact fee is a fee imposed upon a development to help pay for adequate public facilities, such as streets, water supply, parks, schools and so on.  Impact fees are most common in the Sun Belt states where there is a large influx of new residents.  In Minnesota, the only permitted impact fee is parkland dedication.  No other fees or charges may be involuntarily imposed (except for special assessments).

But, Rochester does have an adequate public facilities standard.  In our Land Development Manual, we require a development to show that the streets, water supply, sewer system and such can handle the increased demands on our streets, water supply and sewer system brought about by the new residents who will live in the development.  If the facilities cannot handle the new residents, then the City has every legal right to deny the development or to approve the development with conditions.

The most common condition Rochester has imposed on developments without adequate public facilities is the so-called Prairie Crossing condition (named after the first development to come before the Council with inadequate public facilities after we revised our subdivision regulations in 1999).   That condition reads as follows (pay close attention to the last sentence):

Because on and off site public facilities are currently inadequate to handle the

1





proposed development, the development must be phased-in in a manner consistent with the City's planned infrastructure improvements. Specifically, there are no plans for sanitary sewer to serve the property within the first three years of the City's current six-year Capital Improvement Program. Further, no other arrangements have been made to ensure that adequate utilities will not be available concurrent with the proposed development. Additionally, there are no plans to reconstruct 65th Street N.W., or Bandel Road to handle the additional traffic that this development will generate. As such, no development will occur and no further development permit will be issued until the Council determines public facilities are adequate to accommodate this development.

A developer can live with the Prairie Crossing condition and several have done so (including the Prairie Crossing developer). Or, a developer can work with the City to help make those public facilities adequate. By way of a development agreement, a developer and the City can voluntarily agree as to who pays for what in making public facilities adequate.

That is what happened in the area of 50th Avenue/55th Street N.W. The Council imposed a Prairie Crossing condition on several new developments in that area as the streets were in poor shape and could not handle all of the traffic that would result from the new developments. In the spring of 2000, the City Council created a Transportation District to fund the needed improvements to 50th Avenue and 55th Street N.W. The developers and the City entered into a development agreement and shared the costs involved in making the streets adequate. As a result, the developments proceeded as scheduled and the street capacities were increased as needed.

Where does the TID concept fit into this puzzle? The whole idea of the TID is to give developers advance notice as to how much a developer will be expected to contribute to help improve streets for a development in a particular area of the City. The TID is the City's established policy as to how costs are to be divided between the City and the developer should the parties enter into a development agreement.

The TID charges and the development agreement are completely voluntary on the part of the City and the developer. Either party can say no. The City cannot impose upon or require the payment of any TID charge from any developer. But, if there is no payment of TID charges, then there is no development agreement. And, if there is no development agreement and the streets are inadequate, then you will get the Prairie Crossing condition.

There is one exception to my "the TID charge is completely voluntary" speech. If the City wishes to involuntarily impose a special assessment on property benefiting from a street improvement, the City can do so. But, the amount of the assessment is limited to the amount of increased market value the property experiences as a result of the improvement. A TID charge is NOT intended to be a special assessment charge. Public Works could ask the Council to collect a TID charge as a special assessment. But, we would have to hire an appraiser to see if the TID charge equals the increase in market value for the property. And the developer would hire a different appraiser to say the TID charge does not equal the increase in market value for the property. (Can you say Golden Hill?)

2

13

In summary, the TID concept is intended to establish in advance the division of costs between the City and a developer seeking approval of a development in an area where the city streets are inadequate. If the City and developer agree with the TID charges, the charges would show up in a development agreement. There would be no involuntary imposition of the TID charges (unless the City sought to do so as a special assessment). But, if the facilities are inadequate and the parties are not willing to enter into a development agreement, a developer should expect a Prairie Crossing condition to find its way onto the City's approval of that development. And, I am absolutely convinced the City has every legal right to impose the Prairie Crossing condition when the public facilities impacted by a development are inadequate.

I know the TID concept can be difficult to follow and understand. Please call if you want to talk further about this topic.

Cc:    Stevan E. Kvenvold
       Richard Freese