UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Tap House Real Estate, LLC, *individually*
*and on behalf of the putative class*,

        Plaintiff,

v.

City of Rochester,

        Defendant.

File No. 22-cv-492 (ECT/DTS)

**OPINION AND ORDER**

---

Andrew L. Davick, Anthony J. Nemo, Sr., and Konstandinos Nicklow, Meshbesher & Spence, Rochester, MN, and John Thomas Giesen, Dunlap & Seeger, P.A., Rochester, MN for Plaintiff Tap House Real Estate, LLC.

John M. Baker, Gina Tonn, and Katherine M. Swenson, Greene Espel PLLP, Minneapolis, MN, for Defendant City of Rochester.

---

Plaintiff Tap House Real Estate, LLC, brings this putative class action to recover fees paid to Defendant City of Rochester's Transportation Improvement District Program. Under the program, the City conditioned building permits in Transportation Improvement Districts on payment of fees to fund transportation improvements. Tap House contends the City lacked statutory authority to collect the fees and seeks either an equitable refund or compensation under the Takings Clause. The City moves for summary judgment, and Tap House moves for class certification.

The City's motion for summary judgment will be granted in part. Tap House is barred from recovering the voluntary payment of an illegal tax. And because the payment was voluntary, relegating Tap House to a pre-deprivation remedy does not violate the Due

Process Clause.  However, Tap House's as-applied challenge under the Takings Clause survives summary judgment; a reasonable factfinder could decide that the City has not met its burden to prove Tap House's TID fee was roughly proportional to the traffic impact of Tap House's new restaurant.  Tap House's class-certification motion will be denied because resolving class members' as-applied takings claims would turn on individualized proof.

I

*The City's Transportation Improvement District Program*.  On July 7, 2004, the Rochester City Council passed a resolution establishing a "Traffic Improvement District Program." ECF No. 24-1 at 3–14.  The resolution authorized the City to establish a Traffic Improvement District ("TID") "for any geographic area of the City experiencing or anticipating new growth and substandard streets." *Id.* at 7.  When creating a TID, the City would "establish a cost allocation" that would "be calculated as 75% of the costs of all the transportation projects within the TID." *Id.* at 8.  The purpose of the resolution was to "equitably distribute the transportation improvement costs created by new development between those property owners who benefit from the transportation improvements and the City." *Id.* at 7.  The City established thirteen TIDs under the program. *Id.* at 31–32.  "[S]ewer availability and the sewer serviceability were major factors in delineating these growth areas and, ultimately, the TID boundaries." *Id.* at 67–68.  "Revenue collected within a specific TID" was required to "be spent only within that TID." *Id.* at 9.  But there are no further geographic restrictions on where the money was spent—so TID fees

collected from one parcel in a TID district could be spent on improvements anywhere else within the geographic boundaries of that district.  *Id.* at 104.

*The City establishes the Westside Traffic Improvement District.*  In May 2006, the City created the Westside TID.  ECF No. 29-10.  The Westside TID encompasses 9,868 acres.  ECF No. 29-9 at 4.  The originating resolution estimated total project costs for the Westside TID at $90,027,191.25, of which the developers' share would be $54,667,089.00. ECF No. 29-10 at 7.  To assign this share to properties being developed in the Westside TID, the City organized nine different zoning classifications into five categories that would pay different costs per acre.  *Id.*  For example, R1 / R1x (low density residential) would owe $3,851.46 per developable acre, but R2 / R3 (medium density residential) would pay $7,702.93 per developable acre.  *Id.*  The City arrived at these per-acre rates by "calculating the traffic impact created by [a] theoretical 40 acre site . . . being fully developed."  ECF No. 29-9 at 14.  A graphic is helpful:

RESIDENTIAL LAND USE

| Zoning Group | Developable Area (acres) | Use | Share of Area | Units per acre | Total units | PM Peak Hour Trip Rate | Total PM Peak hour Trips | Ratio to R1-R1x |
|---|---|---|---|---|---|---|---|---|
| R1, R1x | 40 | single family | 50% | 3.25 | 65 | 1.01 | 65.65 | |
| | | townhouse | 50% | 5.5 | 110 | 0.72 | 79.20 | |
| | | Totals | 100% | | 175 | | 144.85 | **1.00** Ratio |
| R2, R3 | 40 | rowhouse | 50% | 8.5 | 170 | 0.78 | 132.60 | |
| | | apartments | 50% | 12.5 | 250 | 0.62 | 155.00 | |
| | | Totals | 100% | | 420 | | 287.60 | **1.99** Ratio |

*Id.* at 29-9 at 16.  For the R1 / R1x zoning group, the City estimated the total number of p.m. peak hour trips for 40 acres of development split between 50% single family homes and 50% townhouses.  *Id.*  at 14–16.  For the R2 / R3 zoning group, the City estimated the

total p.m. peak hours based on 40 acres of land developed into 50% rowhouses and 50% apartments. *Id.* "The goal of this analysis was to develop a comparative ratio of traffic impact for each land use group using the Low Density Residential group as the benchmark." *Id.*[1] Because the fees are based on these aggregated estimates of peak trips, "[a] particular property's specific use—that is, the trip-generation category for the use most similar to the property owner's proposed use—does not determine the amount of TID charge for the particular property." ECF No. 24-1 at 25.

*A developer plans to develop 102 acres within the Westside TID.* Northwest Investments of La Crosse, LLC, assembled more than 100 acres of undeveloped agricultural land in the Westside TID that was zoned R-1 (mixed-use residential). *See* ECF No. 29-12 at 23. In 2011, Northwest Investments proposed to develop roughly 102 acres of land by rezoning the land into M1 (mixed commercial-industrial) and M2 (industrial). *Id.* at 2. The City Council approved the zoning district amendment with certain conditions. *Id.* at 2, 15–18. The first condition was that "[n]o development will be allowed to occur until the City council has determined that all required public facilities are adequate for said development." *Id.* at 15. "Alternatively, the developer [could] request to join with the City in making these inadequate public facilities adequate . . . [by] enter[ing] into a development agreement." *Id.* at 16. In February 2012, Northwest Investments executed a development agreement with the City. ECF No. 29-18. As part of the development agreement,

---

[1]    Because properties within a TID often build out gradually, the "per developable acre" figure was recalculated annually based on the Construction Cost Index. ECF No. 29-9 at 13.

Northwest Investments "acknowledge[d] the Property lies within" the Westside TID and "acknowledge[d] that payment of the applicable [Westside] TID for the total Property will be assigned to each private platted developable lot and proportionated based on land area and Zoning of each respective platted lot." *Id.* ¶ 9(b).

*Tap House purchases a parcel from Northwest Investments to build a restaurant.* In 2012, Natalie Victoria and Christine Stahl started an all-craft beer bar and restaurant called the Tap House. ECF No. 25 ¶ 2; ECF No. 26 ¶ 2. The restaurant was successful, and when the City started to develop west, the owners decided to expand. ECF No. 25 ¶ 2; ECF No. 26 ¶ 4. In October 2018, Northwest Investments entered into a purchase agreement with Tap House to sell 1.49 acres within the planned development. ECF No. 29-23.[2] The purchase price was $973,566.00. *Id.* at 1. In January 2019, the City approved a new plat for Tap House's planned site and adjacent parcels. ECF No. 29-26. Tap House then submitted a site development plan in February. ECF No. 29-29 at 7 (site plan stamped received on February 25, 2019).

*The City charges Tap House a TID fee.* A public works department official responded to the site plan with two items that "need[ed] to be addressed prior to issuance of a zoning certificate and/or building permit." ECF No. 29-29 at 6. The second item was an $80,739.17 TID fee. *Id.* Stahl described the TID fee as "a large, unexpected fee" and "felt the City was holding [Tap House] hostage on this fee." ECF No. 26 ¶ 5. Victoria was

---

[2]     The purchase agreement was executed by Northwest Investments of La Crosse, LLC, and ECNI Enterprises, LLC. *See* ECF No. 29-23. ECNI and Tap House are both owned by Victoria and Stahl. ECF No. 29-45 at 5–6.

"shocked and confused." ECF No. 25 ¶ 4. Tap House only paid the fee "because it was clear we could not move forward with the restaurant unless we did." *Id.* In March 2019, Tap House's builder emailed Tap House with an adjusted fee list, explaining that the "current total is $30,000 less than estimated," and noting "we had all of these figured into our overall budget." ECF No. 29-30 at 2. Tap House's Westside TID fee, totaling $80,739.00, is included in that adjusted fee list. *Id.* On June 21, Tap House closed on the property. ECF No. 29-32. On June 27, the City invoiced Tap House's builder for the Westside TID fee, ECF No. 29-33, and the builder paid the fee in full, ECF No. 29-38 at 2. The City issued the building permit in August. ECF No. 29-35. So far as the record reflects—and notwithstanding Stahl and Victoria's shared surprise over the fee—Tap House never communicated any objections to paying its TID fee to the City. The City stopped collecting TID fees in 2022. ECF No. 18 at 19.

*The claims.* Tap House filed the operative five-count Complaint in state court on February 3, 2022. Compl. [ECF No. 1-1]. The City removed the case to federal court. ECF No. 1. Count I is for declaratory judgment, Compl. ¶¶ 29–33, Count II is "money had and received," *id.* ¶¶ 34–37, Count III is unjust enrichment, *id.* ¶¶ 38–39, Count IV is a claim under the Takings Clause of the United States Constitution, *id.* ¶¶ 40–44, and Count V is a procedural-due-process claim, *id.* ¶¶ 45–49. Tap House seeks a declaration that the City's TID program exceed its statutory authority. *Id.* at 14 (prayer for relief). It also requests a declaration that the terms of the resolution require the City to refund TID fees. *Id.* ¶ 32. For monetary relief, Tap House seeks a full refund of TID fees paid on behalf of itself and would-be class members. *Id.* ¶¶ 33, 35, 39. Alternatively, Tap House requests

6

damages for the unlawful exaction of TID fees in violation of the Takings Clause of the United States Constitution. *Id.* ¶¶ 43, 44.

## II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id.* at 255.

## A

The City seeks to dismiss Counts II and III—claims for an equitable refund under Minnesota common law—on the ground that Tap House is barred from recovering the voluntary payment of an illegal tax. ECF No. 18 at 32–40. "In Minnesota, the right to claim a refund of taxes voluntarily paid in error is governed by statute. There is no common law action or equitable basis for such recovery."[3] *Acton Constr. Co. v. Comm'r of Revenue*, 391 N.W.2d 828, 832 (Minn. 1986); *cf.* 17 McQuillin *The Law of Municipal Corporations* § 49:77 (3d ed. June 2023 Update) ("The general common-law rule is that taxes voluntarily

---

[3]  The parties seem to agree that no Minnesota refund statute applies to Tap House's TID fee.

paid cannot be recovered[.]").  This rule is derived from the voluntary payment doctrine, "which clearly provides that one who makes a payment voluntarily cannot recover it on the ground that he was under no legal obligation to make the payment."  *Hanson v. Tele-Commc'ns, Inc.*, No. C7-00-534, 2000 WL 1376533, at *3 (Minn. Ct. App. Sept. 26, 2000).  But "[t]he voluntary payment doctrine does not apply when a party makes payments under duress or compulsion, such as when that party must choose between paying or facing loss of possession of its property."  *Best Buy Stores, L.P. v. Devs. Diversified Realty Corp.*, No. 05-cv-2310 (DSD/JJG), 2010 WL 4628548, at *3 (D. Minn. Nov. 4, 2010).

The fighting issue then, is whether Tap House's payment of the TID fee was voluntary or involuntary under Minnesota law.  Recent, binding precedent is in short supply.  As the Minnesota Supreme Court described the rule in 1892:

> [T]he courts have not attempted to lay down any definite and exact rule of universal application by which to determine whether a payment is voluntary or involuntary.  From the very nature of the subject, this cannot be done, as each case must depend somewhat upon its own peculiar facts.  The real and ultimate fact to be determined in every case is whether or not the party really had a choice,—whether "he had his freedom of exercising his will."

*Joannin v. Ogilvie*, 52 N.W. 217, 218 (Minn. 1892).  In *Joannin*, the court found that the payment of a mechanic's lien under protest was involuntary because the landowner had an overdue mortgage "upon which foreclosure was threatened, with no means to pay except money which he had arranged to borrow on a new mortgage."  *Id.* at 218–19.  There, the lien caused duress because it interfered with the landowner's urgent need to take out the new mortgage.  *Id.*  The landowner's remedy of commencing a suit was insufficient

because of this urgency. *Id.* at 218. Later cases likewise conclude payments are involuntary when a person or entity is placed under sufficient temporal pressure. In *Panton v. Duluth Gas & Water Co.*, a business disputed charges for water, claiming the meter "did not correctly measure the amount of water passing through it," 52 N.W. 527, 527 (Minn. 1892). After the defendant threatened to shut off the water supply, the business paid the charge under protest. *Id.* The court found that "such a case falls within the class in respect to which it may be said that the payment is virtually compulsory, and not voluntary." *Id.* Similarly, in *Knutson Hotel Corp. v. City of Moorhead*, the city threatened to shut off water service if the hotel refused to pay contested sewage-disposal charges, 84 N.W.2d 626, 628 (Minn. 1957). The threat to turn off the water "constitute[d] duress and ma[de] the payments involuntary." *Id.* at 630.

In *Moore v. Village of Gilbert*, the Minnesota Supreme Court found that a payment was involuntary despite seemingly less urgent circumstances, 289 N.W. 837 (Minn. 1940). In *Moore*, the city adopted "an ordinance making unlawful the moving of buildings within its corporate limits without a written permit." *Id.* at 837. Plaintiff wanted "to move a number of houses from within [the city's] limits to places outside," and paid the permits. *Id.* Finding the ordinance exceeded the city's statutory authority, the court held the payments were involuntary. *Id.* at 838. It observed that the plaintiff protested the payment and "made the payment in protection of his own right to proceed with legitimate business." *Id.* Although the court did not articulate an urgent need for the plaintiff to move the buildings, it observed that he could have faced "fine or imprisonment" for violating the ordinance. *Id.*

Two more recent Minnesota Court of Appeals decisions address when payments are voluntary or involuntary in the context of illegal development conditions. In *Country Joe, Inc. v. City of Eagan*, building contractors successfully challenged a road unit connection charge paid as a condition for the issuance of building permits, No. C4-98-618, 1998 WL 713481, at *1 (Minn. Ct. App. Oct. 13, 1998) (unpublished), *review denied* (Minn. Dec. 22, 1998). The court rejected an argument that "because the charge was a condition for the issuance of building permits," the charge was involuntary, concluding there was "no evidence presented of undue consequences of the failure to pay the charge." *Id.* at *2. The court also found insufficient that the builders would have "experienced costly delays had they sought legal remedies prior to paying the charge." *Id.* Likewise in *Crystal Green v. City of Crystal*, a partnership seeking to develop land objected to a dedication requirement but agreed to dedicate the land to move forward with the project, 421 N.W.2d 393, 393–94 (Minn. Ct. App. 1988), *review denied* (Minn. May 25, 1988). Because Crystal Green "did not consult the City about possible dedication requirements prior to payment" and because "all the development expenses were incurred after Crystal Green had knowledge of the dedication requirement," the court concluded "there is no showing Crystal Green acted under duress or was coerced by the City into complying with the dedication." *Id.* at 394. The court emphasized that Crystal Green could have challenged the dedication through mandamus or declaratory judgment before filing the final plat. *Id.*

No reasonable factfinder could determine that Tap House's payment of TID fees was involuntary. The urgency here is clearly less than *Joannin*, *Panton*, and *Knutson Hotel*; the threat of foreclosure and loss of water are materially different than construction

delays.  Moreover, all four Minnesota Supreme Court cases discussed involved payments made under protest.  The absence of protest here, although not dispositive, cuts against Tap House.  *Cf.* 2 John Martinez, *Local Government Law* § 23:33 (Apr. 2024 Update) ("Protest by the taxpayer is some evidence of duress[.]").  Nor does Tap House point to any specific facts in the record to establish duress.  *See* ECF No. 33 at 6–12.  Rather, it seems to solely rely on the status of the TID fees as a condition for Tap House's building permit.  *Id.*  But both *Crystal Green* and *Country Joe* rejected the notion that conditioning development on the payment of an illegal tax was alone enough to render that payment (or dedication) involuntary.  As in *Country Joe*, Tap House offers "no evidence . . . of undue consequences of the failure to pay the charge."  *Country Joe*, 1998 WL 713481 at *2.  Although the record offers conflicting accounts of when Tap House learned about the TID fee, *compare* ECF No. 26 ¶ 5 (Stahl's declaration describing the fee as "unexpected"); *with* ECF No. 29-30 at 2 (Tap House's builder stating that the Westside TID fee was figured into its overall budget), as in *Crystal Green*, nothing prevented Tap House and its agents from finding out such a fee existed before entering a purchase agreement.  *See Crystal Green*, 421 N.W.2d at 394 ("Crystal Green did not consult the City about possible dedication requirements prior to payment of the $5,000 earnest money.").  Minnesota Court of Appeals decisions are not foolproof predictions of how the Minnesota Supreme Court would decide the involuntary-payment question presented here, but they may be instructive.  *See Friedberg v. Chubb & Son, Inc.*, 691 F.3d 948, 951 (8th Cir. 2012).  And as a practical matter, the Minnesota Supreme Court's denial of petitions for review in both cases adds somewhat to their predictive weight.  Taken in conjunction with the Minnesota Supreme Court's older

involuntary-payment cases, the only reasonable answer is that Tap House's TID payment was voluntary under Minnesota law.

Tap House counters that "the unpublished *Country Joe* opinion was wrong and its analysis of voluntariness was implicitly overruled by *Harstad*'s 'pearl of great price' passage." ECF No. 22 at 15. Some context is necessary. In *Harstad v. City of Woodbury*, the owner of a proposed subdivision challenged the City of Woodbury's infrastructure charge, 916 N.W.2d 540 (Minn. 2018). Like Rochester's TID program, Woodbury's infrastructure charge was a mechanism to "fund the infrastructure improvements" to "create the necessary roadways to serve the burden of the development within [Woodbury's] development areas." *Id.* at 543. After Woodbury calculated Harstad's infrastructure charge at over $1,000,000, he challenged the charge as exceeding Woodbury's statutory authority. *Id.* at 544–45. The Minnesota Supreme Court agreed with Harstad, holding "no part of Minn. Stat. § 462.358 authorizes a statutory city to impose an infrastructure charge." *Id.* at 546. The court also held that "the power to enter into a development contract does not include the power to require a developer to pay an infrastructure charge." *Id.* at 549. In part, it reached this conclusion by reasoning that the infrastructure charge was not voluntary. *Id.* ("The infrastructure charge is thus a requirement and Harstad is correct that there is nothing voluntary about it.").

But *Harstad*'s voluntariness discussion was in the context of a pre-payment challenge to Woodbury's statutory authority, not a post-payment suit for a refund. When asked if the infrastructure charge was voluntary in the sense of a "true negotiated [contract] term," the Minnesota Supreme Court said no, explaining that "the pearl of great price here

12

is approval of the subdivision agreement." *Harstad*, 916 N.W.2d at 549. The question presented by this case is different; whether Tap House was under such pressure to pay the Westside TID fee that a pre-payment lawsuit challenging the fee—such as the suit brought in *Harstad*—was impracticable. Because of this key difference, *Harstad*'s "pearl of great price" passage doesn't change anything here.

As a last resort, Tap House suggests that "[a]t worst, voluntariness . . . is a jury question." ECF No. 33 at 9. Leaving voluntariness to a jury might often make sense. But to survive summary judgment, Tap House "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). It has not. *See* ECF No. 33 at 6–12. Tap House's brief identifies no disputed facts relevant to the voluntariness issue. *See id.* at 2–5 (describing the eight disputed facts in this case). In its six-page discussion on voluntariness, Tap House does not point to any specific facts in the record, nor does it describe inferences to be drawn in its favor per the standard of review. *See id.* at 6–12. Rather, Tap House's position seems to be that the TID fees' status as a condition to develop renders the payment of TID fees involuntary as a matter of law. *Id.* at 7 ("If Tap House did not pay [the fee], Tap House could not develop. Such a pressured payment is not within the volunteer defense and never has been."); 12 ("As *Harstad* held, there is nothing voluntary about such a payment."); ECF No. 22 at 15 ("The crux of the [refund] dispute is . . . the unresolved tension between the unpublished court of appeals opinion in *Country Joe* and the later Minnesota Supreme

13

Court opinion in *Harstad*.").  Having rejected Tap House's theory as a matter of law, summary judgment will be granted.[4]

B

Tap House's procedural-due-process claim fails because due process requires no more protection than Tap House was afforded under Minnesota common law.  The Due Process Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend.

---

[4]      Tap House also argues that the City "cannot deny a refund because the City collected TID fees for pretextual reasons and abandoned the program early, resulting in failure of consideration."  ECF No. 33 at 9–10.  For two reasons, this failure-of-consideration argument is not persuasive.  *First*, as the Eighth Circuit has explained, this failure-of-consideration rule applies to "the voluntary payment of special assessments."  *Pettibone v. Cook Cnty.*, 120 F.2d 850, 856 n.9 (8th Cir. 1941) (collecting cases); *cf. Sloan v. City of Duluth*, 259 N.W. 393, 394 (Minn. 1935) ("[W]e think the present situation is one clearly distinguishable from cases involving purely tax questions.").  Although in *Knutson* the Minnesota Supreme Court discussed the failure of consideration, the court then held that the payment was involuntary.  *Knutson*, 84 N.W.2d at 629–30.  In other words, *Knutson* does not demonstrate that a failure of consideration defeats a voluntary payment outside of the special assessment context.  *Second*, even if this exception applies, there has been no failure of consideration here.  In the context of improvements, the Minnesota Supreme Court has found a failure of consideration when projects for which money was assessed were completely abandoned, *McConville v. City of St. Paul*, 77 N.W. 993, 994 (Minn. 1899) ("[T]he defendant city had abandoned the grading of East Third street as contemplated in the proceedings under which the assessment was made and levied"); *Valentine v. City of St. Paul*, 26 N.W. 457, 458 (Minn. 1886); *In re Cottonwood Cnty. Real Est. Taxes*, 202 N.W. 440, 441 (Minn. 1925) ("When money is taken under a special assessment and the improvement not made and the money is kept there is a failure of consideration.").  Here, the City has not abandoned construction of transportation improvement projects in the Westside TID.  Tap House also relies on *Knutson*, where a hotel was charged fees for water from an air conditioning plant that never actually entered the sewer system.  *Knutson*, 84 N.W.2d at 628.  There, the Minnesota Supreme Court reasoned that the hotel could bring an action "to recover a payment made for a service which was not received" because of this failure of consideration.  *Id.* at 629.  Tap House does not similarly claim it was charged for services not received.

XIV, § 1. "[S]tandard analysis under that provision proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). "Because exaction of a tax constitutes a deprivation of property, the State must provide procedural safeguards against unlawful exactions in order to satisfy the commands of the Due Process Clause." *McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco, Dep't of Bus. Regul. of Fla.*, 496 U.S. 18, 36 (1990).

In light of *McKesson*, there is no question that procedural due process attaches here; the question is whether the procedures available to Tap House were constitutionally sufficient. In the tax context, the government is only required to provide a post-deprivation remedy when it has effectively proscribed a pre-deprivation remedy. *McKesson* is instructive. As the Supreme Court explained, "State[s] may employ various financial sanctions and summary remedies, such as distress sales, in order to encourage taxpayers to make timely payments prior to resolution of any dispute over the validity of the tax assessment." *McKesson*, 496 U.S. at 37. There, Florida "availed itself of this approach, establishing various sanctions and summary remedies designed so that liquor distributors tender tax payments *before* their objections are entertained and resolved." *Id.* at 38. Because Florida required taxpayers to raise their objections "in a postdeprivation refund action," Florida was required to provide a clear and certain post-deprivation remedy. *Id.* at 38–39. By contrast, Tap House could have challenged the City's TID program through a pre-deprivation suit, as in *Harstad*. Having decided in Part II.A that Tap House's TID

15

fee was voluntary (and thus not paid under duress), Tap House was not relegated to a post-deprivation remedy.  Without such duress, Minnesota's confinement of Tap House to pre-deprivation relief was not constitutionally deficient.  *Cf. Harper v. Va. Dep't of Tax'n*, 509 U.S. 86, 101 n.10 (1993) ("The State accordingly may not confine a taxpayer *under duress* to prospective relief." (emphasis added)).

C

As a part of Count I, Tap House seeks a declaration that unspent TID fees must be refunded under the terms of the City's originating resolution.  Compl. ¶ 32.  The resolution states: "Revenue collected in excess of that ultimately needed in the respective TID must be refunded to the property owners in the TID at the time the TID is dissolved."  ECF No. 24-1 at 9.  Tap House contends this language requires a full refund or "at minimum a pro rata refund of the City's unspent TID funds."  ECF No. 22 at 16.

Minnesota's "[r]ules of statutory construction are applicable to the construction of municipal ordinances and resolutions."  *Eagan Econ. Dev. Auth. v. U-Haul Co. of Minn.*, 787 N.W.2d 523, 535 (Minn. 2010).  Under Minnesota law, "[t]he object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature."  Minn. Stat. § 645.16.  Legislative intent is determined "primarily from the language of the [resolution] itself."  *Brayton v. Pawlenty*, 781 N.W.2d 357, 363 (Minn. 2010) (quoting *Gleason v. Geary*, 8 N.W.2d 808, 816 (Minn. 1943) (Peterson, J., dissenting)).  If the plain language of the resolution is clear and unambiguous, "statutory construction is neither necessary nor permitted" and a court applies "the [resolution's] plain meaning."  *Id.* (quoting *Am. Tower, L.P. v. City of Grant*, 636 N.W.2d 309, 312 (Minn.

16

2001)).  "But if the [resolution] is ambiguous—that is, if it is susceptible to more than one reasonable interpretation—we apply canons of construction to discern the legislature's intent."  *Alpine Glass, Inc. v. Ill. Farmers Ins.*, 643 F.3d 659, 664 (8th Cir. 2011).

Tap House's argument seems to be that any unspent TID fees are not "ultimately needed" because the City stopped collecting fees.  *See* ECF No. 33 at 5.  This interpretation is not reasonable in context.  *See State v. Townsend*, 941 N.W.2d 108, 110 (Minn. 2020) (requiring words to be interpreted in context).  When creating a TID, the City estimates the total costs for necessary transportation improvements, including the developers' share.  ECF No. 24-1 at 7–8.  And right before describing when TID fees shall be refunded, the resolution states: "Revenue collected within a specific TID must be spent only within that TID."  *Id.* at 9.  Read in this context, the phrase "ultimately needed" plainly refers to the amount necessary to satisfy the developers' share of all necessary transportation improvements within a specific TID.  So, if the City collected more TID fees from property owners than was eventually needed to complete transportation improvement projects within a district, those excess funds would be refunded to property owners on a pro rata basis rather than be spent elsewhere.  Without any evidence that the City has completed all the traffic improvement projects within the Westside TID, *see* ECF No. 29-9 at 6 (listing road improvement projects), no revenue has been collected in excess of that ultimately needed.

## D

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation."  The Takings Clause is "made

applicable to the States through the Fourteenth Amendment." *Murr v. Wisconsin*, 582 U.S. 383, 392 (2017). "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). Prior to Justice Holme's decision in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), it was generally thought that the Takings Clause reached no further than a "direct appropriation." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014 (1992). But in *Mahon*, "the Court recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Lingle*, 544 U.S. at 537. As Justice Holmes coined, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Mahon*, 260 U.S. at 415.

Since *Mahon*, the Supreme Court has developed per se rules and guidelines to determine when a regulation goes too far—circumstances where regulations amount to regulatory takings requiring compensation under the Fifth Amendment. *See Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 274 (2024). But the Court has developed separate rules to address when permit conditions—also referred to as subdivision exactions—result in a taking. *Id.* In *Nollan v. California Coastal Commission*, the Court held there must be an essential nexus between a legitimate state interest and the permit condition, 483 U.S. 825, 837 (1987). And in *Dolan v. City of Tigard*, the Court added that the condition must be roughly proportional to the development's impact, 512 U.S. 374, 391 (1994). In *Koontz v. St. Johns River Water Management District*, the Court clarified that "the government's

demand for property from a land-use permit applicant must satisfy the requirements of *Nollan* and *Dolan* even when . . . its demand is for money," 570 U.S. 595, 619 (2013). These decisions "reflect two realities of the permitting process." *Id.* at 604. First, "that land-use permit applicants are especially vulnerable to the type of coercion that the unconstitutional conditions doctrine prohibits." *Id.* at 604–05. But second, "that many proposed land uses threaten to impose costs on the public that dedications of property can offset." *Id.* at 605. As Justice Alito explained, "[i]nsisting that landowners internalize the negative externalities of their conduct is a hallmark of responsible land-use policy." *Id.*

### 1

### a

*Nollan* requires there to be an "'essential nexus' between an imposed condition to a permit approval and the purpose of that condition." *Puce v. City of Burnsville*, 997 N.W.2d 49, 57 (Minn. 2023) (citing *Nollan*, 483 U.S. at 836–37). "Essentially, there must be a connection between the legitimate governmental purpose and the imposed condition intended to achieve that purpose." *Id.* For example, in *Dolan*, the Court found that the prevention of flooding and reducing traffic congestion were legitimate public purposes. *Dolan*, 512 U.S. at 387. Requiring the landowner to dedicate greenway and bicycle pathways were reasonably linked to those public purposes. *Id.* at 387–88.

Development in the Westside TID increased traffic in an area with limited transportation infrastructure. Facilitating this new traffic required expensive improvements. This new traffic was a negative externality resulting from developments such as Tap House's restaurant. *Koontz*, 570 U.S. at 605 (describing one example of a

negative externality as "increase[d] traffic congestion").   Requiring landowners to "internalize" such negative externalities is not only permissible, it "is a hallmark of responsible land-use policy."  *Id.*  Westside TID fees were to be spent only on designated transportation improvement projects within the district to compensate for such increased traffic.  Therefore, there is an essential nexus between the City's exaction of TID fees from Tap House and the legitimate governmental purpose of mitigating traffic congestion.  *See Puce*, 997 N.W.2d at 58 ("The City imposed the fee to fund the acquisition or improvement of open space and parkland following the development of Puce's property.  A connection existed between the fee and the purposes the City sought to achieve, thus, an essential nexus between the two was present."); *City of San Marcos v. Loma San Marcos, LLC*, 234 Cal. App. 4th 1045, 1060 (2015) ("[T]here was a reasonable relationship between the impacts that were projected from the new development and the . . . street improvement fair share payments."); *N. Ill. Home Builders Ass'n, Inc. v. Cnty. of Du Page*, 165 Ill. 2d 25, 32 (1995) ("[A] nexus exists between preventing further traffic congestion and providing for road improvements to ease that congestion.").[5]

b

*Dolan* requires rough proportionality between the imposed fee and the impact of the proposed development.  *Dolan*, 512 U.S. at 391.  The burden to show this rests with the

---

[5]    The City argues there is a sufficient connection between the fees and a nearby stoplight.  ECF No. 18 at 25 ("[A]n essential nexus exists between (1) developing a vacant lot into a restaurant and (2) satisfying a condition by which the owner helps to mitigate adverse traffic impacts to a nearby intersection.").  But this is not a fair representation of the at-issue condition because Tap House's fees were not earmarked or spent specifically on that stoplight.

City.  *Id.* at 391 n.8.  "No precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development."  *Id.* at 391.  In other words, "the city must make some effort to quantify its findings" beyond conclusory statements.  *Id.* at 395–96.

A survey of cases is instructive.  In *B.A.M. Development, LLC, v. Salt Lake City*, the Utah Supreme Court interpreted rough proportionality as requiring "rough equivalence" between the impact of the development and the value of the exacted condition, 196 P.3d 601, 603–04 (Utah 2008).  It instructed the trial court to "compare the market value of the exacted property with the cost to the government of alleviating the development's projected increase in traffic volume."  *B.A.M. Dev., L.L.C. v. Salt Lake Cnty.*, 282 P.3d 41, 45–46 (Utah 2012).  On remand, the trial court found "that the proportion of cost attributable to B.A.M.'s development was 5% of the entire road-widening, which amounted to $337,500," while the exaction was worth $83,997.  *Id.* at 46.  Rough proportionality was satisfied because the road-improvement cost attributable to the development was greater than the value of the exaction.  *Id.*  By contrast, in *Goss v. City of Little Rock*, the Eighth Circuit found that a required dedication was not roughly proportional because it was based on the city's estimate of traffic that "conceivably" could be "generated at some unknown point in the future if a strip mall were erected on Goss's land, although there [were] no plans to build a strip mall on the property and there [was] no reason to expect one to be built," 151 F.3d 861, 863 (8th Cir. 1998).

In *Mira Mar Development Corp. v. City of Coppell*, the Texas Court of Appeals applied rough proportionality to legislatively imposed fees, 421 S.W.3d 74, 97 (Tex. App. 2013).  It held that inspection fees were not roughly proportional because they were pegged to construction costs, not the city's inspection costs.  *Id.* at 97.  But it found that a capital improvements plan allowed the city to determine the development's "projected impact with precision that far exceeded the constitutional requirement of rough proportionality."  *Id.* The court emphasized that the impact fees were "spent only on the designated capital improvements, roadways and water and sewer services."  *Id.*  In other state court cases, "the government generally satisfies the nexus and rough proportionality test with ease by introducing some evidence relating to the 'methodology and functioning' of its exactions." *F.P. Dev., LLC v. Charter Twp. of Canton*, 16 F.4th 198, 207–08 (6th Cir. 2021) (collecting cases); *see also Puce*, 997 N.W.2d at 60 (analyzing a park-dedication fee under a statutory analog); *City of San Marcos*, 234 Cal. App. 4th at 1063–64 ("[W]e see no impropriety in the methodology that was used to generate traffic projections, which by their nature are approximations."); *Herron v. Mayor & City Council of Annapolis*, 388 F. Supp. 2d 565, 571 (D. Md. 2005) (easily finding that an impact fee satisfied rough proportionality).  By contrast, in *F.P. Development*, a generally applicable tree-mitigation ordinance failed rough proportionality because the township lacked any meaningful evidence of harm caused by a plaintiff clearing a drainage ditch clogged by fallen trees and other debris.  *F.P. Dev.*, 16 F.4th at 202, 206–07.

The City contends that rough proportionality is satisfied because "[t]he TID charge to [Tap House] is only 17.3% of the $464,377" to build a stoplight at a nearby intersection.

ECF No. 18 at 29. This is not persuasive. The City fails to explain why it makes sense to attribute 17.3% of the stoplight's cost to Tap House. Without some effort to apportion (or at least explain) Tap House's relative impact on the need for the stoplight, this percentage figure is not helpful. *See B.A.M. Dev.*, 282 P.3d at 45–46 (finding that a development was attributable to 5% of the road-widening). Could the City constitutionally require Tap House to pay 25% of the stoplight? What about 50%? Or 100%? It doesn't say. Remember, rough proportionality is designed to prevent a landowner from "giv[ing] up more than is necessary to mitigate harms resulting from new development." *Sheetz*, 601 U.S. at 276. The City's 17.3% figure doesn't prove this. And evidence in the record undercuts its theory. Phases I and II of Northwest Investment's proposed development were expected to generate "1,967 trips during the weekday p.m. peak hour." ECF No. 29-11 at 6. The City's traffic engineer forecasted that Tap House's restaurant would generate 86 p.m. peak hour trips. ECF No. 29-27 at 10. Based on this brief independent examination of the record, attributing 17.3% of the stoplight's cost to Tap House hardly seems fair.[6]

---

[6]    Tap House argues that the City's stoplight-based argument is pretext and should not be considered. ECF No. 33 at 13. Tap House seems to imply, without citation to authority, that reviewing courts are limited to considering a city's contemporaneous basis for imposing a condition. Some courts have expressly rejected this idea. *Hammer v. City of Eugene*, 121 P.3d 693, 694 (Or. App. 2005) (holding that the government may prove rough proportionality at trial even if it had not made findings when requiring the exaction); *Town of Flower Mound v. Stafford Ests. Ltd.*, 135 S.W.3d 620, 644 (Tex. 2004) ("[W]hile the determination usually *should* be made before a condition is imposed, *Dolan* does not preclude the government from making the determination after the fact."). *Hammer* and *Flower Mound* are persuasive. After all, takings law should not be conflated with due process. *See Pietsch v. Ward Cnty.*, 991 F.3d 907, 909–10 (8th Cir. 2021); *Lingle*, 544 U.S. at 541–42 (2005). If Tap House's fee did not exceed the cost on the public to mitigate traffic congestion caused by the new restaurant, then no property was taken in the constitutional sense.

Cases previously discussed suggest the City could satisfy rough proportionality at a higher level of generality by demonstrating the adequacy of its methodology as applied to Tap House. *E.g.*, *F.P. Dev.*, 16 F.4th at 207 (discussing state-court cases); *Mira Mar*, 421 S.W.3d at 97. Some facts demonstrating the adequacy of its methodology are in the record. *See* ECF No. 18 at 6–10 (describing how the fees are calculated). The City's methodology and designated transportation improvements seem somewhat analogous to the capital improvements plan that *Mira Mir* found more than sufficient. *See Mira Mar*, 421 S.W.3d at 97. Unlike in *F.P. Development*, where the township's fees were more than a decade out of date, *F.P. Dev.*, 16 F.4th at 206, the City updated its costs yearly. ECF No. 29-9 at 13. And the City's per-acre estimate did not overestimate Tap House's traffic impact; rather, it resulted in an *underestimate*. *Compare* ECF No. 19-1 at 5, *with* ECF No. 29-27 at 10. So Tap House cannot argue the City's per-acre estimate resulted in it paying too much.

But a few seemingly important facts are missing. Are the transportation improvement projects within the Westside TID reasonably related to new development? *See* ECF No. 18 at 6–7 (briefly describing that Rochester "identified the set of traffic-infrastructure projects"). And where is Tap House located in the Westside TID relative to these transportation improvement projects? In other words, does traffic generated by Tap House's restaurant reasonably contribute to the necessity of transportation improvement projects paid for by its TID funds? *Cf. Flower Mound*, 135 S.W.3d at 644–45 (describing how reciprocal advantages from a transportation-improvement policy cannot be evaluated in the abstract). After all, the Westside TID covers more than 9,000 acres. And the City

24

identifies no transportation improvement project within the Westside TID, other than the stoplight, impacted by traffic from Tap House's restaurant.  Given the need to construe reasonable factual inferences in Tap House's favor and the City's focus on the stoplight, a reasonable factfinder could decide the City's burden to prove rough proportionality has not been met.  *See Heritage at Pompano Hous. Partners v. City of Pompano Beach*, No. 20-61530-CIV-SMITH/VALLE, 2021 WL 8875658, at *8 (S.D. Fla. Dec. 15, 2021) ("[I]t is an issue for the jury to decide whether . . . there is a rough proportionality between the public costs of the Project and the Improvements.); *Skoro v. City of Portland*, 544 F. Supp. 2d 1128, 1131 n.1 (D. Or. 2008) (concluding that rough proportionality is a mixed question of law and fact which may be submitted to a jury).  *But see City of Perris v. Stamper*, 376 P.3d 1221, 1231 (Cal. 2016) ("*Nollan* and *Dolan* issues are for the court, not a jury, to decide because they are mixed questions of law and fact in which the legal issues predominate.").  Summary judgment will therefore be denied as to Tap House's as-applied takings claim.[7]

2

Tap House represented at oral argument that it was also bringing a facial challenge to the resolution under *Nollan* and *Dolan*.  This was not clear from the Complaint or its briefing.  *See* Compl. ¶¶ 40–44; ECF No. 33 at 13–15; ECF No. 22 at 17–18.  To the extent

---

[7]  Two relevant questions have not been raised by the parties and therefore will not be answered here.  First, whether "a permit condition imposed on a class of properties must be tailored with the same degree of specificity as a permit condition that targets a particular development."  *Sheetz*, 601 U.S. at 280.  Second, the "threshold question" of "whether the traffic impact fee would be a compensable taking if imposed outside the permitting context."  *Id.* at 280–81 (Sotomayor, J., concurring).

it brings a facial challenge, summary judgment will be granted to the City.  A facial challenge is "the most difficult challenge to mount successfully," requiring "the challenger [to] establish that no set of circumstances exists under which the [resolution] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 971 (8th Cir. 2003) (asking whether regulations "may be constitutionally applied under *any* set of factual circumstances").

Tap House identifies several theories it suggests render the TID program unconstitutional on a wholesale basis: (1) "the lack of nexus between road adequacy and sewage flow," ECF No. 22 at 24; (2) the City's failure to consider whether Tap House paid a "proportionate share of all 'macroscale' traffic infrastructure [within the Westside TID]," *id.* at 18; (3) the transportation improvement projects just being "a wish-list of future road projects," *id.*, and (4) "that 75 percent of those costs would be paid by [developers]," *id.* None of these theories passes muster given the framework established in Part II.D.1.

Charging developers impact fees to pay for transportation improvements within a development area, drawing the boundaries of those districts based on anticipated development (in turn based on sewer), requiring developers to pay a percentage of those improvements, and calculating the fee based on a per-acre estimate of generated traffic, do not render any application of the City's TID program unconstitutional, let alone all applications.  *Cf. F.P. Dev.*, 16 F.4th at 207–08 (6th Cir. 2021) (collecting cases); *Puce*, 997 N.W.2d at 60; *City of San Marcos*, 234 Cal. App. 4th at 1063–64; *Herron*, 388 F. Supp. 2d at 571; *Mira Mar*, 421 S.W.3d at 97; *Sheetz*, 601 U.S. at 284 (Kavanaugh, J., concurring) ("[T]oday's decision does not address or prohibit the common government practice of

imposing permit conditions, such as impact fees, on new developments through reasonable formulas or schedules that assess the impact of classes of development rather than the impact of specific parcels of property."). Depending on the location of designated transportation improvement projects within a TID and a given development's traffic footprint, it is possible for a proposed development to pay a TID fee out of proportion with its traffic impact. Likewise, the City could designate a "wish list" of projects not reasonably related to a district's anticipated development. But these possibilities do not demonstrate that the TID program is unconstitutional in most, let alone all, applications.

### III

Because Tap House's as-applied takings claim survives summary judgment, turn to its class-certification motion. Several general rules govern the adjudication of a class-certification motion. "The class action is an 'exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). "District courts must engage in a 'rigorous analysis' to determine whether the requirements of Rule 23 have been satisfied." *Postawko v. Mo. Dep't of Corr.*, 910 F.3d 1030, 1036 (8th Cir. 2018) (citation omitted).

"A party seeking class certification 'must affirmatively demonstrate . . . compliance' with Rule 23." *Hudock v. LG Elecs. U.S.A., Inc.*, 12 F.4th 773, 775 (8th Cir. 2021) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). The Rule "does not set forth a mere pleading standard." *Dukes*, 564 U.S. at 350. Rather, the party "must show that the proposed class satisfies Rule 23(a)'s threshold requirements of numerosity,

commonality, typicality, and adequacy, and that the class fits within 'one of the three subsections of Rule 23(b).'" *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 374 (8th Cir. 2018) (quoting *Webb v. Exxon Mobil Corp.*, 856 F.3d 1150, 1155 (8th Cir. 2017)).

It makes sense to begin and end with the predominance requirement of Rule 23(b)(3).[8] Under Rule 23(b)(3), Tap House is required to demonstrate that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members, and [(2)] that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (citing 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1777, at 518–19 (2d ed. 1986)). The inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 William B. Rubenstein, *Newberg on Class Actions* § 4:49, at 195–96 (5th ed. 2012)). The Supreme Court has explained the difference between individual and common questions:

> An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same

---

[8]     Tap House also sought certification under Rule 23(b)(1) and Rule 23(b)(2). *See* ECF No. 22 at 21–23. But it only sought certification under those rules with respect to its refund claim. *Id.* at 22 ("The refund rights available to those who paid TID to those funds . . . presents a 'limited pool' scenario."); 23 ("The claim for a declaration of refund rights [under the resolution] presents a cohesive claim.").

> evidence will suffice for each member to make a prima facie
> showing or the issue is susceptible to generalized, class-wide
> proof.

*Tyson Foods*, 577 U.S. at 453 (cleaned up).  The Rule 23(b)(3) predominance inquiry is

governed by an "even more demanding" rigorous analysis than Rule 23(a).  *Comcast Corp.*,

569 U.S. at 34.  When conducting this rigorous analysis, courts must examine "what the

parties would be required to prove at trial."  *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023,

1029 (8th Cir. 2010).

    As Part II.D makes clear, Tap House's surviving, as-applied takings claim is not

susceptible to generalized, class-wide proof.  That's because the City is required to prove

rough proportionality through landowner-specific evidence.  Determining each developer's

traffic impact would require examining trips generated and the burden of those trips on

transportation infrastructure within thirteen different TIDs.  Some developers' claims

might be amenable to similar proof—for example, other developers that paid TID fees in

Northwest Investment's roughly 100-acre development.   But deciding as-applied

challenges for prospective class members who paid TID fees for developments located in

different TIDs would require examining substantially different facts.  Because important

evidence would vary from member to member, common issues do not predominate.  *See*

*Tyson Foods*, 577 U.S. at 453.

    Tap House counters by pointing to *Beck v. City of Whitefish*, where a court granted

class certification of a *Nollan/Dolan* claim, No. CV 22-44-M-KLD, 2023 WL 6379334 (D.

Mont. Sept. 29, 2023).  This reliance is misplaced.  There, a city conditioned building

permits on the payment of impact fees for water and wastewater services.  *Beck*, 2023 WL

6379334, at *1.  The city calculated the amount of fees "by applying the base rates for a specific sized meter and multiplying any excess fixture units, above a base level of fixture units determined for that meter size, by a cost per fixture."  *Id.* at *2.  There, plaintiffs argued that the city (1) "misapplied the maximum impact fee rates" recommended by third-party reports, resulting in inflated fees; (2) used an "erroneous method for counting water fixture units"; and (3) "unlawfully included the anticipated cost of three water and wastewater-related projects."  *Id.*

There are material differences between *Beck* and this case.  To start, two of the *Beck* plaintiffs' theories were brought as facial challenges and the city "essentially admitted liability on [the third] theory."  *Beck*, 2023 WL 6379334, at *11–12.  Here, only Tap House's as-applied challenge will survive summary judgment.  Moreover, *Beck*'s theories were susceptible to common proof.  Those plaintiffs claimed, for example, that the city accidentally used a maximum impact fee rate "as the base impact fee" for a certain size of water meter.  Whether a city overcharged landowners by misapplying its own methodology is an issue that could be resolved in a single stroke.  But Tap House does not claim the City incorrectly applied its methodology.  Nor does it identify some similarly cohesive theory susceptible to class-wide proof.  To the extent it generally attacked the constitutionality of the TID program, these alleged class-wide infirmities were rejected in Part II.D.  Because what remains of this case is whether the City can prove rough proportionality, and because this will require individualized proof, Tap House's class-certification motion will be denied.

**ORDER**

Therefore, based on the foregoing, and on the files, records, and proceedings herein,

**IT IS ORDERED THAT**:

1.      Defendant City of Rochester's Motion for Summary Judgment [ECF No. 16]

is **GRANTED in part** and **DENIED in part** as described in Part II.

2.      Plaintiff Tap House's Motion for Class Certification [ECF No. 20] is

**DENIED**.


Date:  July 19, 2024                                      s/ Eric C. Tostrud
                                                                    Eric C. Tostrud
                                                                    United States District Court

31